## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

FREEMAN BUCHANAN, III        )
                                    )
               Plaintiff,     )
                                    )
v.                              )       **No. CIV 19-029-RAW-SPS**
                                    )
CHRIS ELLIOTT, et al.,        )
                                    )
              Defendants.   )

## OPINION AND ORDER

This action is before the Court on Defendants' motions for summary judgment. The Court has before it for consideration Plaintiff's complaint (Dkt. 1), the defendants' motions (Dkts. 73, 74, and 75) and a special report prepared at the direction of the Court, in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) (Dkt. 36). Plaintiff has not filed responses to the motions for summary judgment.

**Background**

Plaintiff is a pro se prisoner in the custody of the Oklahoma Department of Corrections (DOC), who is incarcerated at Clara Waters Community Corrections Center in Oklahoma City, Oklahoma. He brings this action under the authority of 42 U.S.C. § 1983, seeking relief for alleged constitutional violations occurring during his incarceration at the Wagoner County Detention Center (WCDC) in Wagoner, Oklahoma. The defendants are Chris Eliott, a/k/a Chris Elliott, Wagoner County Sheriff; Shane Sampson, Wagoner County Jail Administrator; Ashley Aldrich, M.D., WCDC Physician; and Kalup Philps, a/k/a Kaleb Phillips, WCDC Detention Officer.

Plaintiff alleges that on June 5, 2018, he was assaulted by Defendant Phillips when he was "smashed into doors as a battle ram." He claims he then was placed into a restraint chair and denied medical care despite his SC joint dislocation. (Dkt. 1 at 5).

Plaintiff also claims that because of medical neglect before the alleged assault, the damage caused by the new joint dislocation increased. He asserts he inconsistently received ibuprofen and muscle relaxants, and he developed a circulation disorder caused by medical neglect. *Id*. at 5. Plaintiff also alleges someone tampered with his mail *Id*. at 7

Defendants allege in their motions for summary judgment that Plaintiff was arrested by the Wagoner County Sheriff's Office and placed in the WCDC on May 21, 2018. After pleading guilty to a number of crimes and being sentenced on September 21, 2018, he was released to the custody of the DOC on October 2, 2018, to serve his sentence from the Wagoner County District Court. (Dkts. 36-6, 36-7 at 18-32, 36-8, 36-9, 36-38).

Defendants further allege that while Defendant Elliot, Wagoner County Sheriff, is statutorily responsible for the operation of the WCDC, the direct day-to-day responsibility for jail operations is the responsibility of Defendant Sampson, the Jail Administrator. (Dkt. 7 at 29).

Defendants assert the WCDC medical staff are employees of the WCDC or the Wagoner County Sheriff's Office. A nurse works on weekdays from 8:00 a.m. to 5:00 p.m., and Defendant Dr. Aldrich works two days a week at the facility and is on call on weekends. (Dkt. 36-2; Dkt. 36-4).

2

**Standard of Review**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A party opposing a motion for summary judgment, however, may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**Defendant Chris Elliott**

Defendant Chris Elliot, Wagoner County Sheriff, has filed a motion for summary judgment, alleging among other things, that he did not personally participate in any constitutional violations against Plaintiff. (Dkts. 73, 74).

Plaintiff claims in his complaint that he sent a grievance to Defendants Elliott and Sampson, who allegedly claimed the grievance was not received. (Dkt. 1 at 7). Sheriff

Elliott allegedly stated "he has the last decision it's his jail he run it his way Nobody can tell him how to run his jail." *Id.*

Plaintiff has attached a copy of an Inmate Request to Staff directed to Defendant Elliott, dated July 30, 2018, asking for an investigation into his case and issues concerning the altercation and his medical treatment. *Id.* at 12-13. The response from Elliott stated, "I have reviewed the documentation associated with the alleged incident. The D.O.'s [sic] responded in the proper manner according to WCSO use of force policy. *Id.* at 12.

"Personal participation is an essential allegation in a § 1983 claim." *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) (citations omitted). *See also Mee v. Ortega*, 967 F.2d 423, 430-31 (10th Cir. 1992). Plaintiff must show that a defendant personally participated in the alleged civil rights violation. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). Supervisory status is not sufficient to support liability under § 1983. *Id. See also Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151-52 (10th Cir. 2006) ("Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights."). Further, the "denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by the plaintiff, does not establish personal participation under § 1983." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citations omitted).

To the extent Plaintiff may be arguing that Defendant Elliott is liable as a supervisor, it is insufficient for Plaintiff to show a defendant had authority over those who allegedly

committed a constitutional tort. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). "Supervisory liability 'must be based upon active unconstitutional behavior' and 'more than a mere right to control employees.'" *Serna*, 455 F.3d at 1153 (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)).   Accordingly, Plaintiff must demonstrate a "deliberate, intentional act" by Elliott that "caused or contributed to the alleged violation." *Jenkins*, 81 F.3d at 994-95.   "A plaintiff may satisfy this standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance." *Id*. at 995 (citations omitted).

After careful consideration of the pleadings and other submitted materials in this case, the Court is of the view that there are no genuine issues of material fact concerning whether Defendant Chris Elliott personally participated in the alleged constitutional violations. Therefore, Defendant Elliott's motion for summary judgment (Dkt. 73) is GRANTED.

**Defendant Shane Sampson**

Defendant Shane Sampson, WCDC Jail Administrator, also has filed a motion for summary judgment, alleging in part, that he did not personally participate in the alleged mail tampering.  As stated above, Plaintiff claims he sent a grievance to Defendants Elliott and Sampson, however, the defendants claimed the grievance was not received.  (Dkt. 1 at 7). Plaintiff does not offer any evidence that this grievance was in any way connected to a constitutional violation or that Defendant Sampson somehow personally participated in the alleged violation.

Generally, prison authorities must process incoming and outgoing mail promptly. *See, e.g., Nicholson v. Choctaw County*, 498 F. Supp. 295, 310-11 (S.D. Ala. 1980). Delays that are not a product of intentional interference or a large-scale breakdown in a prison's mail system, however, do not violate a prisoner's constitutional rights. *See Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999) (temporary delay or isolated instance of delay not a First Amendment violation; policy of sending incoming publications through property room was reasonably related to screening mail for contraband); *Armstrong v. Lane*, 771 F. Supp. 943 (C.D. Ill. 1991) (unintentional loss and delays in handling prisoner's mail, "while understandably frustrating . . . fail to rise to the level of a constitutional violation").

On June 11, 2018, Plaintiff submitted an Inmate Request to Staff to Defendant Sampson, complaining that his outgoing legal and personal mail was not being forwarded, and his incoming mail was not being provided to him. Defendant Sampson reviewed the issue, and provided Plaintiff with a copy of his mail log on June 11, 2018. The mail log showed that Plaintiff's outgoing mail was being forwarded and his incoming mail was provided to him. (Fact 17, Dkt. 74 at 12; Dkt. 36-37).

The WCDC has policies for "Mail Collection" and "Outgoing Mail" for the processing of incoming and outgoing inmate mail. Pursuant to these policies, an inmate's non-legal incoming or outgoing mail is subject to being read and searched for contraband. The policies further provide that incoming mail is to be delivered to the inmate and outgoing mail is to be placed in the facility mailbox for pick up the next business day. (Dkts. 36-13;

Dkt. 36-14).

To the extent Plaintiff is raising a claim that he was denied access to the courts, he must demonstrate actual injury. *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996). "To do so, he must show that any denial or delay of access to the court prejudiced him in pursuing litigation." *Treff v. Galetka*, 74 F.3d 191, 194 (10th Cir. 1996). Plaintiff has not alleged he was prejudiced.

Regarding his personal mail, Plaintiff has failed to demonstrate any interference in his sending or receiving it, and he does not dispute the mail records offered by Defendants or offer any specifics to support his claim. "Correspondence between a prisoner and an outsider implicates the guarantee of freedom of speech," *Treff v. Galetka*, 74 F.3d 191, 194 (10th Cir. 1996). Due to security implications, however, the management of inmate correspondence is recognized as a necessary component of prison administration, *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989).

After careful review, the Court finds there are no genuine issues of material fact concerning whether Plaintiff's mail was mishandled or whether Defendant Sampson personally participated in any of Plaintiff's alleged constitutional violations. Thus, Defendant Shane Sampson's motion for summary judgment (Dkt. 74) is GRANTED.

**Defendants Dr. Ashley Aldrich and Kaleb Phillips**

Defendants Dr. Ashley Aldrich and Kaleb Phillips also have filed a motion for summary judgment, alleging they are entitled to summary judgment on Plaintiff's claims

against them. (Dkt. 75).

### *Medical and Dental Claims Against Defendant Aldrich*

The special report shows that on February 13, 2018, prior to his detention in the WCDC, Plaintiff visited the Porter Health Clinic in Porter, Oklahoma, for left shoulder pain from an injury when he was hit with a baseball bat approximately a year before the visit. Plaintiff had a knot on his clavicle toward the front of his left shoulder. The Porter Health Clinic personnel told Plaintiff to do shoulder stretch exercises, and he was given diclofenac sodium 75 mg. and citalopram 20 mg. for his depression. (Dkt. 40-2 at 7-9).

Plaintiff returned to the Porter Health Clinic on April 10, 2018, complaining of pain from his wisdom tooth and for a follow-up he had missed. He stated he had stopped taking the citalopram and diclofenac sodium which previously were prescribed. He claimed the diclofenac sodium was not helping his back--not shoulder--pain from a 2017 baseball bat injury. No assessment or plan was noted by the Porter Health Clinic. (Dkt. 40-2 at 4-6).

Just prior to his detention in the WCDC, Plaintiff was seen again at the Porter Health Clinic on May 21, 2018, with complaints of pain in his shoulder and left collarbone. He claimed he had been told he has arthritis. He requested pain medication and wanted to know what steps he could take to improve his shoulder. He was advised of exercises he could perform for his neck, and he was given cyclobenzaprine 10 mg. and indomethacin 25 mg. (Dkt. 40-2).

Upon his booking into the WCDC on May 21, 2018, the Medical Screen Form for

Plaintiff indicated he was of "healthy mind and body and [did not] need immediate medical care." The form further indicated that Plaintiff had no visible or obvious signs of trauma, that he was alert and oriented, and that he did not need immediate hospital care. A note on the form stated he had no medications at intake; however, it did indicate that "Porter Clinic has his new meds." (Dkt. 40-3 at 2-3).

The Porter Health Clinic records did not indicate Plaintiff was under any specific ongoing care or treatment instructions for his back or shoulder, nor was he being prescribed narcotic pain medications or muscle relaxers at that time. (Dkt. 40-2).

On May 28, 2018, Plaintiff submitted a Medical Form at the WCDC requesting a muscle relaxer. On May 29, 2018, medical staff denied Plaintiff's request, because the facility did not prescribe routine pain medications or treat chronic pain. Plaintiff was advised that ibuprofen was available in the commissary. (Dkt. 40-4 at 1-2).

Defendant Dr. Aldrich has submitted a declaration stating that the WCDC has a practice of discouraging and greatly limiting the introduction of scheduled narcotics into the jail, unless no other reasonable alternative is available, and the medication is absolutely necessary. Dr. Aldrich agreed with that practice in the jail setting, as well as in a private setting. (Dkt. 36-4 at 2).

On May 31, 2018, Plaintiff submitted a Medical Form complaining of pain in his left hand and left wisdom tooth. He was seen by medical that day and started on a protocol of penicillin. (Dkt. 40-4 at 3-4). Plaintiff continued taking the penicillin until June 5, 2018,

9

when Medical discontinued the medication due to Plaintiff's refusal to show his mouth after taking it. *Id.* at 47.

On June 5, 2018, Detention Officer Misty Crouch was notified that an inmate in G-pod had pressed the call button and was "hitting the door." Officer Crouch and Detention Officer John Hanes entered G-pod and heard screaming. When the door was opened, they observed Plaintiff and another inmate (Singleton) on top of a third inmate (Brown), punching him. Detention Officer Haynes pulled Plaintiff off inmate Brown, and inmate Singleton backed away at the time. The inmates were separated to calm them down. (Dkt. 36-31; Dkt. 36-32).

After inmate Brown was moved, someone in the G-pod again pressed the panic button, and Officers Crouch and Haynes returned. They found Plaintiff sitting on the floor, crying, holding his right shoulder and neck, and saying he hurt his neck. There were no obvious signs of trauma at the time, and Plaintiff was given an ice pack and told to put the ice on his shoulder and lie down. Plaintiff also was told that he would be checked on shortly. Plaintiff was put on 48-hour lockdown for fighting. (Dkt. 36-31; Dkt. 36-32).

Later that day, Plaintiff submitted a Medical Request Form, requesting treatment for an open wound on his neck, chest pains stemming from the altercation, and emotional problems. Plaintiff was seen in medical, treated for his injuries, given 800 mg. of ibuprofen for one week, along with Seroquel 200 mg. to stabilize his mood. Plaintiff continued to receive the Seroquel on a daily basis for the remainder of his detention in the WCDC. He

did not complain of an injury to his head during his visit to the medical office.  (Dkt. 40-4 at 4-5, 47-52).

On June 19, 2018, Plaintiff submitted a Medical Request Form complaining of tightness in his neck muscles and pain in his chest and shoulder.  He was seen in medical for these complaints on June 20, 2018, where his vitals were taken, and he was given ibuprofen 800 mg. for pain.  (Dkt. 40-4 at 7).

On July 2, 2018, Plaintiff submitted a Medical Request Form complaining of pain in his left back tooth, neck, shoulder, and chest.  Plaintiff was seen in medical the same day and given ibuprofen 800 mg. for pain.  A dental appointment was scheduled for him for July 23, 2018 which was the earliest date available.  It was further noted that Plaintiff would be started on penicillin one week before the appointment.  He was advised to get Orajel and ibuprofen from the commissary to keep on hand, or he could request ibuprofen during the med pass.  (Dkt. 40-4 at 22-23).

On July 4, 2018, Plaintiff submitted two separate Medical Request Forms, complaining that he was being denied medical care.  Medical replied to these complaints the same day, advising that Plaintiff never had been denied medical care, all of his requests had been addressed, he had been advised that he would be provided 800 mg. of ibuprofen as needed for pain, and a dental appointment had been set for July 23, 2018.  (Dkt. 40-4 at 8-10).

On July 9, 2018, Plaintiff submitted a Medical Request Form requesting to see the

doctor.  Plaintiff was seen by medical on that date and advised that he had seen multiple providers, medical did not prescribe pain medications, Dr. Aldrich had directed that he be given ibuprofen as needed, he had a good range of motion in his arm and neck, and there was no reason for him to see Dr. Aldrich for his complaint of chronic neck pain.  Plaintiff submitted a second Medical Request Form on July 9, 2018, complaining that he had not received a copy of his medical request.  Medical responded and provided the requested records.  (Dkt. 40-4 at 11-15).

On July 10, 2018, Plaintiff submitted a Medical Request Form, making a general complaint about his medical visit the preceding day.  Medical noted Plaintiff's complaints and provided him with copies of all of his medical records. (Dkt. 40-4 at 16-18).

On July 16, 2018, Plaintiff was started on a daily prescription of penicillin 250 mg., which was discontinued on July 23, 2018, the date of his dental appointment. (Dkt. 40-4 at 48).  On July 23, 2018, Plaintiff was taken to his dental appointment for a tooth  extraction.  The dentist, however, refused to pull the tooth because of the severity of the infection.  The dentist recommended follow-up with an oral surgeon and continuation of antibiotics.  The dentist also advised Dr. Aldrich that Plaintiff did not need to see an oral surgeon urgently, but eventually needed to be seen.  (Dkt. 40-4 at 24).

On July 25, 2018, Plaintiff submitted a Medical Form, inquiring about an appointment with an oral surgeon. Medical responded to Plaintiff's request on July 26, 2018, advising they were in the process of trying to find an oral surgeon who was willing to treat

him.  (Dkt. 40-4 at 25-27).  Also on this date, Plaintiff was started on a daily prescription of penicillin 500 mg., which was discontinued by Dr. Aldrich on August 8, 2018.  (Dkt. 40-4 at 48-49).

On August 14, 2018, Plaintiff submitted a Medical Request Form, requesting a release of his medical record from Porter Health Clinic.  Medical requested the record from Porter Health the same day.  (Dkt. 40-4 at 28-29).

On August 17, 2018, Plaintiff submitted a Medical Request Form complaining of pain and stating he thought he was going blind.  Plaintiff was scheduled to see the nurse in medical for this complaint on August 21, 2018, but he declined the visit on that date.  (Dkt. 40-4 at 30).

On August 20, 2018, Plaintiff submitted three separate Medical/Medical Request Forms, wherein he complained about pain in his tooth and shoulder, claimed that being placed in the restraint chair had worsened his condition, and complained that he was being denied medical care.  Medical noted Plaintiff's complaints and noted to monitor Plaintiff for any new or worsening symptoms.  (Dkt. 40-4 at 31-36).

On August 27, 2018, Plaintiff submitted two separate Medical Forms in which he again complained about pain in his tooth, needing a dental appointment, and pain in his chest, neck and lower back.  On August 30, 2018, medical noted that it would follow up with the dental office when it was next open on September 10, 2018.  (Dkt. 40-4 at 37-39).

On   September 4, 14, and 17, 2018, Plaintiff submitted four separate Medical/

Medical Request Forms in which he again complained about pain in his tooth, chest, shoulder, and neck.  Dr. Aldrich saw Plaintiff in person at the facility on September 18, 2018, and addressed his continuing complaints.  Dr. Aldrich advised Plaintiff that his dental issue was non-emergent at that time, so she would not authorize extraction by an oral surgeon unless Plaintiff or his family would pay for the visit up-front.  (Dkt. 40-4 at 40-46).  Plaintiff was released into DOC custody on October 2, 2018.  (Dkt. 36 at 2)

It is Dr. Aldrich's professional medical opinion that Plaintiff's shoulder injury and pain was caused by a chronic, long-standing injury to his shoulder, and any treatment or surgery to this area would be elective and not mandatory.  Dr. Aldrich also opines that the treatment, evaluation tools, and medication provided throughout Plaintiff's incarceration in the WCDC were all reasonable under the facts and circumstances known at that time.  (Dkt. 36-4).

Dr. Aldridge further alleges that no employee of the Wagoner County Sheriff's Office or the WCDC attempted to influence or hinder the treatment she recommended or provided to Plaintiff.  At no time did Plaintiff advise Dr. Aldrich that the jail staff was failing to provide him any prescribed medications.  In addition, at no time did Dr. Aldrich, any medical staff, or jail staff deny Plaintiff any necessary medical care nor was there any unnecessary delay of any medical treatment for any known serious medical need.  *Id.*

The Supreme Court has addressed the Eighth Amendment prohibition against cruel and unusual punishment in the context of medical attention:

14

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under §1983. (Citations and footnotes omitted).

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

"Deliberate indifference" involves both an objective and a subjective component. *Wilson v. Seiter*, 501 U.S. 298-99 (1991). The prisoner must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837.

With this standard in mind, the Court is of the view that the acts complained of do not show deliberate indifference to Plaintiff's medical needs as alleged. It is clear from the record that medical care was provided. Where there is such evidence of a "series of sick calls, examinations, diagnoses, and medication . . . it cannot be said there was a 'deliberate indifference' to the prisoner's complaints." *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976). To the extent plaintiff is complaining about the inadequacy of medical care provided, the Court finds Plaintiff is merely asserting a difference of opinion as to the kind and quality of medical treatment necessary under the circumstances. It is well settled that this type of disagreement fails to give rise to a cause of action under § 1983. *See McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977), *cert. denied*, 435 U.S. 917 (1978), and cases cited therein.

15

To the extent Plaintiff is complaining of a delay in his treatment, "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm." *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).  The Court finds Plaintiff has not made this showing.

Regarding Plaintiff's dental care, the Tenth Circuit Court of Appeals has held that "dental care is one of the most important medical needs of inmates." *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980).  "Accordingly, the [E]ighth [A]mendment requires that prisoners be provided with a system of ready access to adequate dental care." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (citation omitted).  In Plaintiff's case, this Court finds that he was promptly taken for an evaluation, however, his dental problem was not an emergency.  Therefore, his treatment with non-prescription pain medication and penicillin did not violate the Eighth Amendment.

After careful review, the Court is of the view that there are no genuine issues of material fact concerning whether Plaintiff's medical and dental care were consistent with the requirements of the Eighth Amendment.  Therefore, summary judgment is GRANTED for Defendant Dr. Ashley Aldrich on these claims.

### Excessive Force Claim Against Defendant Phillips

Defendant Phillips alleges he is entitled to summary judgment with regard to Plaintiff's excessive force claim that arose on June 5, 2018.  Plaintiff described the alleged

incident in his complaint:

> [O]n June 5, 2018 I was assaulted by DO Philps durning an altercation. I was taken from my cell to be placed in the restraint chair. At this point I had not done anything worthy of being placed in the chair or any punishment.
>
> Mr. Andrew stated that I wasn't going to stop take him up front. At which point I wasn't doing anything. However; Jess Andrea, Ty, Philps, and Andrew was present upon cuffing one they let Philps take me in fact who the conflict existed with, to booking. Leaving Cell G-8 Mr. Philps while my jumpsuit was down passed my ankles waist proceeded to use my face as a battle ram to access G-Pod door to continue to each door leading to booking. I continued to state that I couldn't walk cause the jumpsuit and then I was slammed against the nurse wall in front of medical. They disregarded my inquires that occured from the fight prior to place me in restrants. Terry Berner observed the open wounds and notified medical nurse and moved the restrant off the open lasheration's the nurse along with DO Jess also addressed the neck injurig I further fell in booking due to the jumpsuit was smashed [illegible].

*Id.* at 13 (errors in original).

Defendant Phillips alleges Plaintiff's excess force claim is without factual support.

He asserts the following:

> On June 5, 2018, Detention Officer Misty Crouch was notified that an inmate in G pod had pressed the call button and was "hitting the door." Officer Crouch and Detention Officer John Hanes went to G-pod, entered the pod, heard screaming and, once the door was opened, observed Plaintiff and another inmate (Singleton) were "on top of" a third inmate (Brown) punching him. Detention Officer Haynes pulled Plaintiff off of inmate Brown and inmate Singleton backed away at the time. The inmates were separated to calm them down. (Fact No. 12). After inmate Brown was moved someone in the G-pod once again pressed the button and Officers Crouch and Haynes went back again, and entered the G-pod to find Plaintiff sitting on the floor crying, holding his right shoulder and neck and saying he hurt his neck. There were no obvious signs of trauma at the time and Plaintiff was given an ice-pack and told to put the ice on his shoulder and lay down and told that he would be checked on shortly. Plaintiff was put on 48-hour lock down for

17

fighting at that point and time. (Fact No. 13).

On June 5, 2018, Plaintiff submitted a Medical Request Form requesting treatment for an open wound to his neck and chest pains stemming from the altercation and treatment for emotional problems. . . . When Plaintiff was taken to medical on June 5, 2018, he attempted to pull away from, resisted, and lunged at officers in the medical area and was placed in the restrain[t] chair for a couple of hours as a result. Defendant Phillips assisted in breaking up the earlier altercation involving and assisted in placing him in the restraint chair. However, he did not "smash" Plaintiff into a doorway or use him as a "battle ram" while securing, working with, or walking with Plaintiff that day or any other day. (Fact No. 15). Sheriff Elliott subsequently reviewed documentation of the June 5, 2018 incidents and did not note any violation of the WCDC's use of force policy by the responding officers. (Fact No. 16).

(Dkt. 75 at 20-21).

The Supreme Court has held "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 395 n.10 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). The Supreme Court further held that the Eighth Amendment subjective standard for excessive force claims brought by prisoners, which requires that defendants act "maliciously and sadistically to cause harm," does not apply to Fourteenth Amendment excessive force claims brought by pretrial detainees. *Id.* at 396-400. "[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one," and "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id*. at 396-97.

[O]bjective reasonableness turns on the "facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. A court must make this

18

determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *See ibid*. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979).

*Kingsley*, 576 U.S. at 397.

       Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *See, e.g., Graham*, 490 U.S. at 396. We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.

*Kingsley*, 576 U.S. at 397.

       Finally, the use of an objective standard adequately protects an officer who acts in good faith. We recognize that "[r]unning a prison is an inordinately difficult undertaking," *Turner v. Safley*, 482 U.S. 78, 84-85 and that "safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face," *Florence v. Bd. of Chosen Freeholders of the County of Burlington*, 566 U.S. 318, 326 (2012). Officers facing disturbances "are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. For these reasons, we have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer. We have also explained that a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate.

*Kingsley*, 576 U.S. 389, 399-400 (2015).

As stated above, Plaintiff received medical treatment after the cell altercation.  His Medical Request Form complained of an open wound, neck and chest pain, and emotional problems caused by the altercation.  The Nurse Assessment/Provider Orders/Notes state that Plaintiff received 800 mg. of ibuprofen BID for one week "due to previous neck/shoulder injury."  He also received medication to stabilize his mood.  There is no evidence that Plaintiff complained of a head or face injury during his visit to the medical office.  (Dkt. 40-4 at 4-5).  Further, the response to Plaintiff's Inmate Request to Staff dated June 11, 2018, states that Plaintiff was placed in the restraint chair because he had threatened and charged an officer.  (Dkt. 36-36).

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal quotation marks omitted) (citation omitted).  Here, the Court finds there are no genuine issues of material fact concerning whether any force used by Defendant Phillips against Plaintiff was objectively reasonable.  Therefore, Defendant Phillips' motion for summary judgment (Dkt. 75) is GRANTED.

**ACCORDINGLY,**

1. Defendant Chris Elliott's motion for summary judgment (Dkt. 73) is GRANTED.

2. Defendants Dr. Ashley Aldrich and Shane Sampson's motion for summary judgment (Dkt. 74) is GRANTED.

3.     Defendant Phillips' motion for summary judgment (Dkt. 75) is GRANTED.

4.     All remaining pending motions are DENIED AS MOOT.

**IT IS SO ORDERED** this 30th day of March 2021.

Ronald A. White
United States District Judge
Eastern District of Oklahoma